*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Salvador JACINTO**
Aviation Structural Mechanic First Class (E-6), U.S. Navy
Appellant

**No. 201800325**

Decided: 30 April 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Roger E. Mattioli

Sentence adjudged 25 June 2018 by a general court-martial convened at the Washington Navy Yard, Washington, D.C., consisting of officer and enlisted members. Sentence approved by the convening authority: confinement for eight years and a bad-conduct discharge.

For Appellant:
*Major Maryann N. McGuire, USMC*
*Captain Nicholas S. Mote, USMC*
*Lieutenant Mike Wester, JAGC, USN*

For Appellee:
*Lieutenant Kurt W. Siegal, JAGC, USN*

Judge STEPHENS delivered the opinion of the Court, in which Senior Judge TANG and Judge LAWRENCE joined.

_____

## PUBLISHED OPINION OF THE COURT

_____

STEPHENS, Judge:

A general court-martial convicted Appellant, contrary to his pleas, of rape of a child, sexual abuse of a child, and child endangerment by culpable negligence, in violation of Articles 120b and 134, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts seven assignments of error (AOE), which we have re-numbered: (1) the military judge abused his discretion when he denied Appellant's motion to order the production of one of the child victims' mental health records or review them in camera; (2) the military judge erred by refusing to grant a continuance; (3) the military judge erred by refusing to admit evidence against a child victim under Military Rule of Evidence [Mil. R. Evid.] 412; (4) all of the specifications, except for one, fail to state the time of the offense with sufficient particularity, and the military judge erred in denying Appellant's motion for a bill of particulars; (5) the military judge erred in instructing the members they could use evidence of one charged offense to convict Appellant of other charged offenses; (6) Naval Consolidated Brig Miramar's policy forbidding contact with Appellant's non-victim biological children amounted to a violation of Article 55, UCMJ, and the Eighth Amendment to the United States Constitution; and (7) the same Naval Consolidated Brig Miramar policy violated the First and Fifth Amendments to the Constitution.[2] We find no prejudicial error and affirm.

## I. BACKGROUND

### A. Movements of a Navy Family

In 2008, Appellant left Naval Air Station Patuxent River in Maryland for temporary assignment in Guam. There he met a local bartender, EJ. She had

_____

[1] 10 U.S.C. §§ 920b, 934 (2016).

[2] AOEs 6 and 7 were raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). They are consolidated in section II.F.

two daughters from a previous marriage living with her, "Emily" and "Julie."[3] The girls were six and eight, respectively. Before Appellant rotated back to Maryland, he got EJ pregnant. Soon after Appellant left Guam, EJ, her daughters, and their newborn son, followed him to Maryland. Over the course of the next year, the new family added one more son between Appellant and EJ, and would add another about five years later. Appellant and EJ eventually married.

In 2010, the family moved from Maryland to Jacksonville, Florida—all except for Emily. She spent the next year in Guam with her biological father. The family lived in a house in Jacksonville on Stonegate Drive. In that house they hosted many parties and gatherings, which often featured intoxicated adults staying overnight and sleeping in bedrooms or on floors and couches. Two such events were Fourth of July parties in 2011, when Emily was still in Guam with her father, and in 2012, after she re-joined the family in Jacksonville.

In late February or early March of 2013, EJ travelled to Thailand for her father's funeral. Then, in May of 2013 the family moved to another house in Jacksonville on Pine Lake Drive. Soon after that move, Appellant deployed to Japan for six months and returned in December.

In 2014, the family all returned to Maryland. Just as in Jacksonville, they lived in one house—in Lexington Park—and then moved locally about a year later to a home on Range Road in Lusby, Maryland. At the home on Range Road, Emily became a close friend of a young girl who lived across the street. Her name was "Anna,"[4] and she was in sixth grade when she met Emily, who was then in seventh grade and a year older. The Jacinto family continued having get-togethers featuring alcohol. In the basement of the Range Road home, Appellant would often gather with his friends and play "beer pong" with Emily and Anna present.

**B. Emily and Julie Disclose Allegations Against Appellant**

In May 2017, Appellant's step-daughters were ages 14 and 16 and in eighth and tenth grade. Anna was in seventh grade. On May 1, Emily's mother confronted her about some "hickeys" she had. Emily initially denied

---

[3] To protect the victims' privacy and for ease of reading, Appellant's eldest step-daughter, "EB," will be called by the pseudonym "Emily," and the younger step-daughter, "JB," will be called by the pseudonym "Julie."

[4] We will refer to the witness "AA" with the pseudonym of "Anna."

she had been sexually active with her boyfriend, but then admitted to it. This prompted a fight between Emily and her mother resulting in Emily being forbidden to see her boyfriend anymore. At trial, pursuant to the military judge's Mil. R. Evid. 412 ruling, the members heard a sanitized version. EJ testified she and Emily had a fight about Emily's boyfriend. EJ told the members, "I felt like they were getting too close and too fast" and she "made them break up."[5]

About two hours later, Emily was in her room with Anna. She used Anna's phone to text her mother to ask her to come to her room. Emily had been crying and was upset, as was Anna. Anna was saying to Emily, "Just tell your mom, tell your mom."[6] In the past year, Emily had told Anna that Appellant had sexually abused her. Emily then told her mother Appellant had sexually abused her. But this was not the first time her mother had heard this from Emily.

Back in 2013, the family lived at the home on Stonegate Drive in Jacksonville. When EJ went to Thailand for her father's funeral, Emily—then only ten and in fourth grade—made a tearful video-call to her mother. She was prompted to make the call when Appellant tried to help her up on to the kitchen counter by touching her buttocks. Upset by this, Emily told her mother Appellant had "humped her from behind"[7] in the master bedroom in the past few months before her mother had left for Thailand. EJ told Emily, "You better not be lying."[8] The next day, EJ returned to Florida and questioned Emily about the accusations. Initially EJ just spoke with Emily.

At trial, Emily testified that Appellant had sexually assaulted her three different times. He had come up behind her while she was doing dishes and put his hand down her pants. Another time while she was doing dishes, he did the same thing, except he digitally penetrated her vagina and forced her to touch his penis. On a third occasion in the master bedroom, he leaned Emily over on his bed and rubbed his penis through clothing against her buttocks and genital area while she was on her stomach and then on her back. At trial, EJ recalled that Emily's descriptions of the sexual assaults in 2017 were the same as they were in 2013.

---

[5] Record at 1072-73.

[6] *Id*. at 1074.

[7] *Id*. at 1085.

[8] *Id*. at 885.

In 2013, after EJ and Emily's initial conversation, they met in the garage of the family home and both confronted Appellant about the allegations. Appellant denied it and Emily was crying. When EJ told Emily that if these allegations were true she would have to call the police and Appellant would be taken away, Emily "kind of freaked out."[9] It was then that Emily recanted and said she lied.[10] Emily never brought it up to her mother again.

Now in May 2017, when Emily raised these old allegations, her mother went and confronted Appellant. He was on the back porch drinking alcohol. When she asked him if the allegations were true, according to EJ, "he was quiet, and he didn't deny it, and he didn't admit to it" but then "was like, 'I don't know,'" and "just kept quiet."[11] EJ then brought Emily out on the balcony so Appellant could hear what she had to say. Emily was crying and said, "You know what you did."[12] Appellant made no response.

The day after Emily told her mother—again—about these allegations, she broke down at school. She was sent from her class to see a school counselor, where she disclosed what Appellant had done to her. The school counselor, a mandatory reporter under Maryland law, contacted civilian police, who then contacted the Naval Criminal Investigative Service. The following day, Emily was admitted to a local hospital for nearly a week.

The day Emily was admitted to the hospital, EJ and her other daughter, Julie, sat in a parked car in the hospital parking lot. When she asked Julie if "anything ever happened between her and [Appellant]," she was "quiet at first" and then said "yes."[13] Julie told her mother that Appellant had touched her "down there."[14] Julie later testified that when she was 11 years old, Appellant had sexually assaulted her late in the evening at the 2012 Fourth of July party held at the family's Stonegate Drive home in Jacksonville. She awoke to Appellant's hand down her pajamas and inside her underwear after she fell asleep on a couch. Appellant then digitally penetrated her vagina as he said "Shhh."[15] She pushed him away and ran into the bedroom she shared

---

[9] *Id.* at 1086.

[10] At trial, Appellant argued that Emily recanted during the initial video call with EJ and presented testimony from one of EJ's friends that EJ told her this.

[11] Record at 1076.

[12] *Id.* at 1077.

[13] *Id.* at 1083.

[14] *Id.*

with Emily. She never told any adults about this incident until she told her mother in the hospital parking lot.[16]

## C. Litigation Concerning Emily's Mental Health Records and Other Evidence

### 1. Emily's medical records

In pretrial litigation, Appellant attempted to obtain medical records documenting Emily's week of inpatient treatment at the hospital. The military judge ordered the hospital to produce Emily's prescription records and her mental health diagnoses. He found the remainder of her records were privileged and that Appellant had not made a showing of vital necessity to require production or an in camera review.

The week before the trial began, the hospital produced the required records. While at the hospital, Emily was prescribed Tylenol and four other medications, including Thorazine. It was the Thorazine that was at issue. This medication was prescribed for "psychotic agitation."[17] Appellant had a child psychologist provide expert testimony that Thorazine was a "known antipsychotic medication" used to assist patients who may be "stimulated internally by things that are not actually going on" or who could be "laboring under the burden of delusions."[18] But Emily was diagnosed with "depression *without* psychotic features"[19] and the Thorazine was prescribed "*as needed*."[20] There was also no evidence Emily ever exhibited psychotic agitation or ever took Thorazine. The military judge denied Appellant's motion for in camera review of Emily's mental health records and denied his motion for a continuance based on the timeline of the disclosure of the records. The day before trial, Appellant moved the military judge to reconsider his denial of the continuance; the military judge denied the motion to reconsider.

---

[15] *Id.* at 773.

[16] On cross-examination, Emily testified that in 2015, Julie told her Appellant had touched her, but they did not have "a conversation" about it. *Id.* at 913. Emily testified that she believed Julie knew what Appellant had done to Emily because it was a "small family." *Id.* at 914.

[17] App. Ex. LXXIV, "Ruling M.R.E. 513 (Sealed)" at 2.

[18] Record at 322, 325.

[19] App. Ex. CXXVI, "Government Bench Brief ICO MRE 513 (Sealed)" at 10-12; Record at 329 (emphasis added).

[20] App. Ex. LXXIV at 2 (emphasis added).

### 2. Emily's relationship with her boyfriend

As discussed above, the members heard a "sanitized" version of Emily's relationship with her boyfriend and the conflict that arose with her mother because of it. Appellant wanted to tell the "full story" to the members to highlight Emily's purported motive to fabricate and deflect blame away from her own behavior. In the fall of 2016—the beginning of Emily's eighth-grade year—she started seeing her boyfriend. At some point during the school year, they had sexual intercourse. Emily also told her boyfriend that when she was in fourth grade, Appellant "grabbed her butt . . . and looked at her weird."[21] Three days before Emily's 2017 disclosure to her mother, she attended a classmate's "going away" party. There she told several people Appellant had sexually assaulted her. At that party, Emily also engaged in some kind of sexual activity with her boyfriend that left her with "hickeys" on her chest and other parts of her body. Appellant also argued Emily had taken an "ecstasy" pill at the party and started convulsing as a result of either a real or a feigned seizure. When a friend called Emily "an attention whore," she responded by telling people Appellant had sexually abused her.

Appellant filed a motion under Mil. R. Evid. 412 to be allowed to present evidence of Emily's sexual behavior to highlight her alleged motive to fabricate. Specifically, he argued that Emily falsely accused him of sexual abuse because she was in trouble when her mother learned of her sexual activity. The military judge denied the motion in a written ruling. One of his conclusions was based on the fact that EJ had previously discovered Emily had been sexually active with her boyfriend. According to EJ, she and the boyfriend's mother spoke and "cut them off for a little bit."[22] At that time, Emily did not make any allegations. The military judge allowed Appellant to present testimony that Emily was upset about being forcibly "broken up" with her boyfriend because EJ believed they were "getting too close and too fast."[23] He also allowed Appellant to present evidence that Emily and her boyfriend had attended the "going away" party without EJ's permission. Ultimately, Appellant was prevented from introducing evidence of the "hickeys" or any of Emily's explicit prior sexual history with her boyfriend.

---

[21] *Id.*

[22] App. Ex. XXXIII, "NCIS Transcript Interview ICO EJ" at 66.

[23] Record at 1072.

*3. Appellant's motion for a bill of particulars*

Specifications 2, 3, 4, and 5 of Charge I [Article 120b, UCMJ] concerned Appellant's alleged sexual abuse of Emily. The timeframe alleged was "on or about August 2012 to on or about May 2013."[24] This appeared to have been charged to coincide with Emily's testimony that the acts happened before her mother went to Thailand in February or March of 2013 and happened during Emily's fourth grade school year of 2012 to 2013, and also before the family's May 2013 move from the Stonegate Drive house in Jacksonville.

Similarly, with Specifications 1 and 2 of Charge II [Article 134, UCMJ, child endangerment for providing alcohol to a child under 16], Emily and Anna described the many regular parties at the Range Road house in Maryland. In their recorded interviews, Emily and Anna were unable to state with particularity exactly when Appellant provided them alcohol other than to say it generally happened while they were friends. Accordingly, the Government alleged a timeframe of "on or about April 2015 to on or about October 2016."[25]

Appellant moved for dismissal of these Charges and Specifications alleging that they were vague, and, in the alternative, he moved the court to order the Government to produce a bill of particulars. The military judge denied Appellant's motion in a written ruling. He found Appellant was sufficiently on notice of the particular acts he would have to defend against. The military judge also denied Appellant's later motion to reconsider his ruling.

## II. DISCUSSION

**A. The Military Judge Applied an Incorrect Legal Standard to Deny Appellant's Motion to Order Production or Conduct an In Camera Review of Emily's Mental Health Records, But This Did Not Prejudice Appellant**

*1. Standard of review*

We review a military judge's decision to deny the production of mental health records for an abuse of discretion.[26] A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling

---

[24] Charge Sheet.

[25] *Id.*

[26] *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018).

are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable."[27] Appellant is only entitled to relief if the military judge's abuse of discretion "materially prejudiced his substantial rights."[28] Where a constitutional error is alleged, any such error must be shown by the Government to be "harmless beyond a reasonable doubt."[29]

### 2. Military Rule of Evidence 513

The public policy behind Mil. R. Evid. 513 is that "[e]ffective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears."[30] Such treatment may cause "embarrassment or disgrace" and the "mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment."[31] The important public interest in promoting mental health treatment is balanced with the right of an accused to present the most probative evidence during criminal trials.

A party desiring to pierce the confidentiality of mental health treatment records must move the military judge to order production or, in the alternative, move the military judge to conduct an in camera review of the requested records. Before a military judge may even conduct an in camera review, the moving party must demonstrate by preponderance of the evidence, all of the following under Mil. R. Evid. 513(e)(3):

(1) a "specific factual basis" demonstrating a "reasonable likelihood" the records would yield evidence admissible under an exception to the privilege;

(2) the requested information meets one of the several exceptions under Mil. R. Evid. 513(d);

(3) the information sought is not merely cumulative; and

---

[27] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[28] *Chisum*, 77 M.J. at 179.

[29] *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[30] *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996).

[31] *Id.*

(4) the requesting party made "reasonable efforts" to obtain simi-
    lar information through non-privileged sources.

Because "evidentiary rules must cede to the constitutional needs of an
accused,"[32] a military judge may still determine that production, or in camera
review, of mental health records is warranted despite the lack of an enumer-
ated exception under Mil R. Evid. 513(d) being met, when such action is
constitutionally required. In making this assessment, the military judge must
determine whether "*infringement of the privilege* is required to guarantee a
meaningful opportunity to present a complete defense."[33]

### 3. Analysis

The military judge applied the wrong legal standard in conducting his
analysis. In his Conclusions of Law, he wrote that Appellant failed to
demonstrate "a reasonable probability that the records contain information
otherwise unavailable to the defense, and that the information sought is vital
to the defense theory of the case."[34] This standard "conflate[s] the constitu-
tionally required standard envisioned in Mil. R. Evid. 412 [pertaining to the
*admission* of constitutionally required evidence] with Mil. R. Evid. 513
[pertaining to the disclosure or in camera review of constitutionally required
privileged materials]" which we have cautioned against.[35] Because the
military judge applied the wrong legal standard, we find he abused his
discretion and turn to whether this materially prejudiced Appellant's
substantial rights.

We are convinced beyond a reasonable doubt that Appellant suffered no
prejudice. First, there was no evidence Emily ever had the psychotic disorder
Appellant alleges or that she ever took Thorazine because she was suffering
from psychotic disorders or "laboring under delusions." Appellant was far
from showing a "specific factual basis" demonstrating a "reasonable likeli-
hood" the records would yield any evidence admissible under an exception to
the privilege. More important, the timeline does not support Appellant's

---

[32] *J.M. v. Payton-O'Brien*, 76 M.J. 782, 788 (N-M. Ct. Crim. App. 2017) (citing
*United States v. Gaddis*, 70 M.J. 248, 253 (C.A.A.F. 2011)).

[33] *Id*. at 789 (emphasis in original).

[34] App. Ex. LXXIV, "Ruling M.R.E. 513 (Sealed)" at 5.

[35] *Payton*-O'Brien, 76 M.J. at 788 n.25. *See also United States v. Banker*, 60 M.J.
216, 222 (C.A.A.F. 2004) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858
(1982)).

argument. Even if Emily had been suffering from psychotic delusions and had trouble appreciating reality in May 2017, Appellant would have to somehow tie those later-occurring problems to the timeframe when the alleged abuse actually happened, some four years prior. And there was absolutely no evidence she had any mental health problems when she was in fourth grade. Finally, the very fact that Emily merely repeated the same disclosure she had previously made to her mother four years earlier indicates she had at least some mental connection to a past event, which weakens any argument that she was experiencing psychotic disorders.

Despite his application of the wrong legal standard, we cannot find that the military judge's decision to deny production of the privileged records, or his refusal to conduct an in camera review, undermined Appellant's ability to make a constitutional defense or in any way contributed to the verdict.[36] We find no prejudice.

## B. The Military Judge Did Not Err in Denying Appellant's Motion for a Continuance.

### 1. Standard of review

We review a military judge's decision to deny a continuance for an abuse of discretion.[37] An abuse of discretion occurs "where reasons or rulings of the military judge are clearly untenable and . . . deprive a party of a substantial right such as to amount to a denial of justice."[38] Included in the factors we consider are:

> surprise, nature of the evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice.[39]

---

[36] *Chisum*, 77 M.J. at 179 (citing *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003)).

[37] *United States v. Weisbeck*, 50 M.J. 461, 464 (C.A.A.F. 1999).

[38] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997)).

[39] *Id.* (quoting F. Gilligan and F. Lederer, *Court-Martial Procedure* § 18-32.00 at 704 (1991)).

We focus on the "possible impact on verdict" factor of these non-exhaustive factors.

*2. Analysis*

Appellant alleges the military judge abused his discretion in denying his motion for a continuance. Appellant requested the continuance so he could have more time to research whether Emily ever took Thorazine or was having psychotic delusions when she made her 2017 report against Appellant. Our resolution of the Mil. R. Evid. 513 issue weighs heavily on our analysis here.

Appellant had ample time—before the Government's production of Emily's medical records—to gather evidence of Emily's psychotic delusions from non-privileged sources. Prior to Emily's 2017 disclosure, Appellant lived with her and saw her almost continuously for nearly a decade. Appellant's counsel also could have spoken with Emily's friends and teachers, or even gathered evidence of psychotic delusions on social media. It stands to reason that if Emily did have actual psychotic delusions—contrary to her diagnosis of "depression *without* psychotic features"—this behavior would have manifested itself in some way other than solely in the repeated disclosure of her four-year-old allegations against Appellant.

Similar to the reasons stated above, the issue was not necessarily whether Emily experienced psychotic delusions in 2017, but whether she experienced psychotic delusions in 2013 when the sexual abuse is said to have occurred. Even if she was experiencing mental health problems in 2017, the relevant issue was whether those same mental health problems caused her to make a false report *in 2013*. We find there was no possible impact on the verdict because there appears to be no evidence Emily was having psychotic delusions in 2017, and even if she were, it would not necessarily be relevant to the allegations she made in 2013. The military judge did not abuse his discretion.

**C. The Military Judge Did Not Err in Denying the Admission of Impeachment Evidence Under Military Rule of Evidence 412**

*1. Standard of review and Military Rule of Evidence 412*

This Court reviews a military judge's decision to exclude evidence under Mil. R. Evid. 412 for an abuse of discretion.[40] We are mindful that military

---

[40] *United States v. Carpenter*, 77 M.J. 285,288-89 (C.A.A.F. 2018).

judges have "wide latitude" to impose reasonable limits on cross-examination.[41]

Under Mil. R. Evid. 412, evidence of an alleged victim's "other sexual behavior" is generally not admissible in a proceeding involving an alleged sexual offense.[42] There is an exception when the exclusion of the evidence would violate the constitutional rights of the accused.[43] The evidence sought to be admitted must be relevant, material, and favorable—meaning "vital"— to the Defense.[44] Any evidence the military judge believes may be admitted under the "constitutional exception" must then undergo a Mil. R. Evid. 403 balancing test.[45] An accused's right to cross-examination is not unlimited, and the Defense may not cross-examine a witness in "whatever way, and to whatever extent, the [D]efense might wish."[46]

*2. Analysis*

Appellant moved the military judge to permit the Defense to cross-examine Emily and EJ on topics concerning (1) Emily's sexual behavior with her boyfriend at the going away party a few days prior to her disclosure to EJ; (2) that EJ saw the "hickeys" Emily received from her boyfriend; (3) the discussion EJ had with Emily after she saw the "hickeys"; and (4) Emily's disclosures to EJ about her sexual history with her boyfriend.

Appellant argued this cross-examination was vital to his defense. He wanted to portray Emily as resurrecting a recanted, years-old sexual assault complaint only because her mother confronted her about her sexual activity with her boyfriend. Appellant argued this evidence was constitutionally required because it explained Emily's disclosure at the party of her allegations of Appellant's sexual abuse as a deflection tactic, and when she was later confronted by her mother about her sexual activity, it showed a pattern of deflection. In addition, the Defense argued this evidence would show that

---

[41] *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011).

[42] Mil. R. Evid. 412.

[43] Mil. R. Evid. 412(b)(1(C). In contrast to Mil. R. Evid. 513, the constitutionally-required exception is specifically enumerated in Mil. R. Evid. 412.

[44] *Banker*, 60 M.J. at 222 (citing *Valenzuela-Bernal*, 458 U.S. at 867).

[45] *Id*. at 222-23.

[46] *Ellerbrock*, 70 M.J. at 318 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

Emily was willing to initially lie when she was confronted by her mother about sexual activity with her boyfriend.

The military judge denied the motion but did allow Appellant to ask about how Emily raised the allegations in 2017, just without overt reference to Emily's sexual behavior with her boyfriend or her initially lying to her mother about it. The result was that EJ testified she had forbidden Emily to see her boyfriend anymore, saying, "I felt like they were getting too close and too fast" and that she "made them break up."[47]

The issue here is whether, despite the military judge's ruling, Appellant still had the "opportunity for effective cross-examination."[48] We find that he did. Appellant was still able to convey that Emily's motivations for her 2017 disclosure appeared to spring from the fight with her mother over the nature of her relationship with her boyfriend. We are confident that the Defense theories of deflection and motive to fabricate were sufficiently established during Emily, EJ, and Anna's cross-examinations. It is also unsurprising that a teenage girl would be understandably upset about such a turn of events and could give rise to motivations to any number of responses—including blame deflection and even false allegations.

Similarly, in *United States v. Gaddis*, a teenage girl who was the victim of sexual abuse by her step-father reported the misconduct to her mother. She reported it just before she was to receive a medical examination for a school activity. She was concerned the examination would show she had been raped by appellant. The victim's mother had apparently discovered e-mails containing a rumor the victim was sexually active. The appellant wanted to argue that the victim believed her mother was having her medically examined because of the rumor of her sexual activity and she did not want the examination to reveal that to her mother. Our superior court found no abuse of discretion when the trial judge limited cross-examination to referring to the "mother's discovery of the e-mails generically" but did not allow the appellant to refer to the contents of the e-mails or describe them as "relating to sexual activity."[49]

---

[47] Record at 1072-73.

[48] *Gaddis*, 70 M.J. at 256 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

[49] *Id.* at 251.

In opening, Appellant's civilian trial defense counsel (TDC) told the members:

> The family was like a powder keg ready to explode. And it needed a spark. The spark came through the course of May 1st and 2nd of last year, when [Emily] was in trouble for having a prohibited romantic relationship with her boyfriend.
>
> The second time, and she was backed into a corner, there was this huge fight about it. She was caught, she denied it, she later admitted it. And she was told she was going to be cut off from her boyfriend. And it was in the context of that fight that she lodges this allegation.[50]

In closing, the civilian TDC told the members:

> [I]n 2017 she's in trouble with her mom, and you heard from [Anna], there were problems at school as well. Her friends were calling her a liar. Her friends were calling her an attention seeker. Her friends were calling her fake. Her friends were talking behind her back. And these allegations are made.[51]

From beginning to end, Appellant conveyed his narrative to the members, including during cross-examination. The arguments made were as forceful as they would have been had Appellant been able to elicit the lurid details of Emily's sexual behavior. "And once the defendant has been allowed to expose a witness'[] motivation in testifying, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury."[52] The military judge's limitation of cross-examination was proper. We find no abuse of discretion.

Even if the military judge erred, we find the error was "harmless beyond a reasonable doubt" and did not contribute to the verdict obtained.[53] The fact that Emily merely reminded her mother of four-year-old allegations is significant. Even if all of Appellant's theories about Emily and her motivations for her 2017 disclosure to her mother were true—that she only raised the allegations to deflect blame, and that she was dishonest when it came to

---

[50] Record at 713.

[51] *Id.* at 1679.

[52] *Gaddis*, 70 M.J. at 257 (internal quotation marks omitted) (quoting *United States v. James*, 61 M.J 132, 136 (C.A.A.F. 2005)).

[53] *Chisum*, 77 M.J. at 179 (quoting *Mitchell*, 540 U.S. at 17-18).

her sexual activity with her boyfriend—the probative force of this argument would be marginal at best. The issue for the members was the veracity of Emily's 2013 allegations and whether Appellant sexually assaulted her when she was in fourth grade, not what her motivations were when she was in eighth grade. Emily's less-than-pure motivations in 2017—if they were so— were not dispositive of the crucial issue of whether or not Appellant sexually abused her. There might be a different result if Emily had not previously made any consistent allegations. But she did, and the proper focus was on the veracity of the 2013 allegations, not what her motivations were in 2017.

Using the *Delaware v. Van Arsdall*[54] test to evaluate for prejudice, this Court considers the following factors: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.[55]

While it is clear Emily's testimony was central to the Government's case, it was significantly augmented by supporting testimony from EJ about Emily's prior consistent allegations from 2013 and Emily's stated reasons for recanting. Emily's testimony was also corroborated by her disclosure to Anna, which was made long before the fight with her mother over her boyfriend. Emily's school counselor also testified about her disclosure. The net result of this testimony showed Emily's 2017 disclosure was consistent with prior disclosures going back to near the time when the alleged sexual abuse occurred.

The cross-examination was functionally the same as that sought by Appellant, just without the salacious details of Emily's sexual activity with her boyfriend. And while Appellant may argue he was deprived of the opportunity to demonstrate Emily's dishonesty when she denied and then admitted the sexual activity to her mother, he was still able to offer evidence of Emily's bad character for truthfulness. Appellant was allowed to present evidence from one of EJ's friends that in 2013, she believed Emily had bad character for truthfulness, albeit on childish things such as lying about homework and not washing her hair. Finally, the military judge provided the standard instruction on Emily's bad character for truthfulness.

---

[54] 475 U.S. 673 (1986).

[55] *United States v. Jasper*, 72 M.J. 276, 282 (C.A.A.F. 2013) (citing *Van Arsdall*, 475 U.S. at 684).

As for the overall strength of the Government's case, EJ testified about Emily's 2013 report and how it was similar in detail to her 2017 report. The members also received a credible explanation for why Emily recanted in 2013, owing to fear of what would happen to her family. Finally, we consider the fact that, although he denied the allegations the next day while sober, Appellant did not deny the allegations when EJ and then Emily confronted him in 2017. Appellant's first failure to deny the allegations was certainly a factor in the strength of the Government's case. Overall, we find that even if Appellant had been allowed the cross-examination he sought, it would have barely registered in the members' analysis. Thus, we conclude that even if there was any error, it was harmless beyond a reasonable doubt.

## D. Appellant's Specifications Provide Sufficient Particularity

### 1. Standard of review

"Whether a specification states an offense is a question of law that is reviewed de novo."[56] This court reviews the decision of a military judge to deny a motion for a bill of particulars for an abuse of discretion.[57] "To establish an abuse . . . requiring reversal, appellant must show actual surprise or prejudice at trial."[58]

### 2. Analysis

An accused must be given notice through a specification of what his alleged misconduct was, to include the "time and place and nature and circumstances of the offense with clearness and certainty."[59] Part of this notice requirement implicates due process within the Fifth Amendment to the Constitution as a bar to future prosecutions under the Double Jeopardy Clause, and implicates the Sixth Amendment in allowing a criminal defendant a meaningful opportunity to mount a defense.

The Government charged Appellant with various sexual misconduct against Emily "from on or about August 2012 to on or about May 2013" and child endangerment of Emily and Anna "on or about April 2015 to on or about

---

[56] *United States v. King*, 71 M.J. 50, 51 (C.A.A.F. 2012).

[57] *United States v. Williams*, 40 M.J. 379, 381 n.4 (C.M.A. 1994).

[58] *Id.* (citing *United States v. Mobley*, 31 M.J. 273 (C.M.A. 1990)).

[59] *United States v. Cruikshank*, 92 U.S. 542, 566 (1875).

October 2016."[60] Appellant argues these specifications were vague because they did not afford him the opportunity to defend himself. He also argues the military judge abused his discretion in denying his motion for a bill of particulars. We turn first to the issue of the sufficiency of the specifications.

The Government is not required to allege a specific date unless it is an "essential element" of the crime.[61] In child sexual assault cases, longer charging windows are allowed,[62] provided an accused still has reasonable notice of what he is defending against and has an opportunity to defend himself. "Certainly, prosecutors should be as specific as possible in delineating the dates and times of abuse offenses, but we must acknowledge the reality of situations where young child victims are involved."[63]

In *United States v. Williams*, a child sexual assault case in which offenses were alleged to have occurred over a two-month period, our superior court held that because Articles 125 and 134, UCMJ, did not make time a "material element for appellant's criminal offenses, no Fifth Amendment violation occurred."[64] Additionally, our superior court has held that when the Government charges "on or about" in a specification, it is "not required to prove those exact date, if a date *reasonably near* is established."[65] We find that neither Article 120b, UCMJ, (Charge I) nor Article 134, UCMJ, child endangerment (Charge II), have time as a material element. The charge sheet also clearly shows the Government used "on or about" language in the relevant specifications. We find no Fifth Amendment Due Process violation.

The next question is whether the charging window in these specifications deprived Appellant of reasonable notice of what he is defending against. In the aforementioned *Williams* case, the appellant developed a romantic relationship with the single mother of a six-year-old girl that lasted about fifteen months. Several times per week, the appellant would go to the

---

[60] *See* Charge Sheet, Charge I, Specifications 2-5; Charge II, Specifications 1,2.

[61] *Williams*, 40 M.J. at 382 (citing *Ledbetter v. United States*, 170 U.S. 606, 612 (1898); *United States v. Turner*, 975 F.2d 490, 494 (8th Cir. 1992); *United States v. King*, 703 F.2d 119, 124 (5th Cir. 1983)).

[62] *See, e.g.*, *Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005); *Hunter v. New Mexico*, 916 F.2d 595, 600 (10th Cir. 1990).

[63] *Valentine*, 395 F.3d at 632.

[64] *Williams*, 40 M.J. at 382.

[65] *United States v. Hunt*, 37 M.J. 344, 347 (C.M.A. 1993) (emphasis in the original) (citing *United States v. Nersesian*, 824 F.2d 1294, 1323 (2nd Cir. 1987)).

mother's home after his work shift ended and stay the night. In the morning, the mother would leave for work, leaving the appellant and her daughter in the home. About a year after the sexual assaults occurred, the girl disclosed the abuse. She testified that the incident occurred "before Halloween," while there were "different color leaves . . . on the ground," and that she was wearing a "pink sweatsuit"[66] to school that day. This was as specific as she could be. The Government's charging window was "during September 1988 to October 1988."[67] In *Williams¸* the appellant had sufficient notice prior to trial, never attempted to make an alibi defense, and was able to "test the victim's memory and veracity."[68] Our superior court held this charging window was sufficient.

Some four years after the alleged incident, Emily was only able to recall that the sexual assault happened while she was in the fourth grade. This placed the incidents roughly from between August 2012 until May 2013, which was reflected in the specifications. Emily also remembered the incidents occurred when she lived at the house on Stonegate Drive in Jacksonville, from which the family moved in May 2013. Additionally, the Government provided discovery to Appellant indicating Emily called her mother to report the incidents. This call was sometime in February or March of 2013 when Emily's mother was in Thailand for her father's funeral. The Government also disclosed Emily's statements saying that the sexual assaults took place in the family home. While still a relatively broad charging window, this certainly put Appellant on notice of not only what the alleged acts were, but also where they occurred, and a general time frame of when they occurred.

During trial, Appellant was able to probe Emily's memory and had an opportunity to attack the veracity of her testimony. He was able to do so because the specifications provided him some reasonable notice of what the allegations were, what the underlying circumstances were, and a general time-window of when they happened. Finally, the specifications concerning Emily would allow Appellant to "plead a former acquittal or conviction" in case "any other proceedings are taken against him for a similar offence."[69] We

---

[66] *Williams*, 40 M.J. at 380 (alteration in original).

[67] *Id.*

[68] *Id.* at 382 (citing *United States v. Arteaga-Limones*, 529 F.2d 1183, 1193 (5th Cir. 1976), *cert. denied*, 429 U.S. 920 (1976)).

[69] *Russell v. United States*, 369 U.S. 749, 764 (1962) (quoting *Cochran and Sayre v. United States*, 157 U.S. 286, 290 (1895); *Rosen v. United States*, 161 U.S. 29, 34

find the specifications concerning Emily (Charge I, Specifications 2, 3, 4, and 5) to be sufficient.

Largely the same analysis applies to the specifications concerning child endangerment from Charge II in violation of Article 134, UCMJ. The time-window for the specifications was from on or about April 2015 to on or about October 2016. This appeared to coincide with Emily and Anna's memories of the parties at the Range Road house in Maryland and playing beer-pong with Appellant. And just as with the specifications from Charge I, Appellant was able to test the memory and veracity of both Emily and Anna. The Government also called two petty officers who were Appellant's friends and attended the parties. Appellant was able to cross-examine them, too. Finally, Appellant himself called another petty officer friend as a witness to describe what occurred during the parties. Although the exact dates of the parties were not known, Appellant knew exactly *which* parties the Government alleged related to the misconduct. The specifications and the discovery materials clearly placed him on reasonable notice and we find no error.

We now turn to the military judge's denial of Appellant's motion for a bill of particulars. A bill of particulars is not a tool for discovery and should not be used to "force detailed disclosure of acts underlying a charge, or to restrict the Government's proof at trial."[70] The purpose of a bill of particulars is to:

> inform the accused of the nature of the charge with sufficient precision to enable the accused to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable the accused to plead the acquittal or conviction in bar of another prosecution for the same offense when the specification itself is too vague and indefinite for such purposes.[71]

Appellant's stated goal in requesting a bill of particulars was to enable him to potentially present an alibi defense. When he requested a bill of particulars, he had already received in discovery the full investigation detailing Emily's allegations. Although we acknowledge Appellant would have been better situated to potentially present an alibi defense if a specific

---

(1896); *Hagner v. United States*, 285 U.S. 427, 431 (1932); *Potter v. United States*, 155 U.S. 438, 445 (1894); *Bartell v. United States*, 227 U.S. 427, 431 (1913); *Berger v. United States*, 295 U.S. 78, 82 (1935); *United States v. Debrow*, 346 U.S. 364, 377-78 (1953)).

[70] Rule for Courts-Martial [R.C.M.,2016] 906(b)(6), Discussion.

[71] *Id.*

date could have been alleged, the law does not require the Government to provide information it does not have and cannot reasonably ascertain. The Government is not required to force a child witness to guess, or even artificially create, a certain date or time beyond the child's understanding or real memory. Undoubtedly, this would make it easier for an accused to disprove an allegation by casting doubt upon the date offered by the child witness. But this is not the purpose of a bill of particulars.

The military judge denied Appellant's motion in a written ruling. In it he found the Government had provided Appellant with multiple recorded interviews with Emily wherein she specifically identified the locations in Appellant's home where "to the best of her recollection, the offenses took place."[72] In addition, the Government provided more detail in its response to Appellant's Motion to Dismiss. The military judge correctly applied the law, concluding the specifications allowed Appellant to "understand what particular act or omission to defend against."[73] We find no abuse of discretion.

## E. The Military Judge Did Not Err in Allowing Members to Use Evidence of One Charged Offense to Prove Other Charged Offenses

### 1. Standard of review

We review a military judge's ruling to admit evidence under Mil. R. Evid. 404(b) for an abuse of discretion.[74] We apply this standard to the "underlying evidentiary ruling"[75] rather than to the alleged instructional error that resulted from the evidentiary ruling. "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion."[76] "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable."[77]

---

[72] App. Ex. LIV, "Ruling: Motion to Dismiss Specifications 2-7 of Charge II" at 1.

[73] *Id*. at 2 (citing Discussion to R.C.M. 307(c)(3).

[74] *United States v. Harrow*, 65 M.J. 190, 201-02 (C.A.A.F. 2007).

[75] *United States v. Jeter*, 78 M.J. 754, 771 (N-M. Ct. Crim App. 2019).

[76] *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010).

[77] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

*2. Analysis*

Appellant alleges error because the military judge allowed the Government to use an instance of a charged "grooming behavior" to prove his motive and intent in sexually assaulting Emily. The military judge permitted the Government to argue that Appellant's charged act of providing alcohol to Emily while she was underage could be used to prove he sexually assaulted her in 2013.[78]

Prior to trial, Appellant filed a motion in limine to prevent the Government's use of evidence that Appellant "groomed" Emily by providing her with "vape" electronic cigarettes, that he watched (legal) pornography in her presence, and provided Emily and her friend Anna with alcohol.

The military judge denied the motion applying the well-known test from *United States v. Reynolds*[79] for determining the admissibility of uncharged misconduct under Mil. R. Evid. 404(b): (1) the evidence must reasonably support a finding that Appellant committed the prior crimes, wrongs, or acts; (2) the evidence must make a fact of consequence more or less probable; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.

We note Appellant alleges the issue of whether he provided alcohol to Emily, a charged offense, was not litigated prior to trial. This is incorrect. In his ruling the military judge also wrote, "Although the Defense attacks [Emily's] credibility as a 'pathological liar,' the members could reasonably choose to believe her testimony, especially when combined with [Anna's] testimony that AM1 Jacinto did in fact provide both her and [Emily] with alcohol."[80] He also wrote in one of his Findings of Fact, "Providing electronic cigarettes, watching pornography together, and providing alcohol to [Emily] are actions consistent with 'reducing boundaries between an offender and a victim.'" The military judge's ruling was also clearly referenced and ex-

---

[78] The military judge also instructed the members they could use the grooming evidence to find Appellant was guilty of touching Emily's buttocks and hips between April 2015 and October 2016. Record at 1629; App. Ex. CIX at 12. The members acquitted Appellant of that specification.

[79] 29 M.J. 105, 109 (C.M.A. 1989).

[80] App. Ex. LVI, "Ruling: Defense Motion in limine: Mil. R. Evid. 404(b): 'Grooming'" at 3. This written ruling was dated 7 June 2018, just over a week before the trial began.

plained many times during the course of the trial.[81] In a pre-trial Article 39(a) UCMJ, session, the Government's expert discussed Appellant permitting Emily to drink alcohol.[82] The Government also referenced this behavior in its response to Appellant's Motion in limine concerning the Mil. R. Evid. 404(b) offenses.[83]

Appellant also argues the Government never provided pretrial notice that he provided Emily alcohol and that this amounted to the Government using uncharged and unnoticed evidence under Mil. R. Evid. 404(b). This is not what happened. The Government used a broad charging window for the occasions when Appellant offered Emily and Anna alcohol, but it did not charge it as "divers occasions." When the Government attempted to elicit evidence from Emily of more than one occasion, TDC objected on the grounds that any additional occasion was uncharged misconduct and without proper pretrial notification. The military judge sustained that objection and only permitted the Government to offer evidence of a single instance of Appellant providing alcohol to Emily. The military judge found the probative value of the evidence to be high, stating that it suggested a plan to "desensitize [Emily] to illicit, risk-taking behavior and to encourage her to keep it secret from her mother, thus facilitating the sexual abuse."[84]

As we recently noted in *United States v. Jeter*, the *Reynolds* test dealt with the admissibility of *uncharged* misconduct, yet our superior court has used it when reviewing the "use [of] evidence of charged misconduct to prove intent for another charged offense."[85] Thus, the *Reynolds* test is the proper framework for evaluating both uncharged and charged misconduct in the context of Mil. R. Evid. 404(b). We also stated in *Jeter* that "[a]s early as 1984, our superior court recognized that evidence related to one charged offense may be admitted to prove motive or intent for another charged offense."[86] Our superior court made clear in *United States v. Hills*,[87] that

---

[81] Record at 1573, 1574, 1580.

[82] *Id.* at 181.

[83] Appellate Exhibit XXXII, "Government Response to Defense Motion in limine: MRE 404(b) Concerning Uncharged Offenses" at 1, 2.

[84] Appellate Exhibit LVI at 3, "Ruling: Defense Motion in limine: M.R.E. 404(b): 'Grooming'."

[85] *Jeter*, 78 M.J. at 771 (citing *United States v. Tanksley*, 54 M.J. 169, 176 (C.A.A.F. 2000)).

[86] *Id.* at 770.

charged misconduct (subject to the *Reynolds* test) can properly be used to prove other charged misconduct.[88]

We find no errors with the military judge's findings of fact and conclude he used the correct legal principles. We therefore focus on whether his application of the law to the facts was "clearly unreasonable."[89] There was clearly sufficient evidence for a reasonable factfinder to find by a preponderance of the evidence that Appellant provided alcohol to Emily—satisfying the first prong of *Reynolds*. We find the evidence did make a "fact of consequence more or less probable"—specifically that when Appellant allowed Emily to engage in "shared, secretive, illicit, risk taking behavior" that was kept secret from Emily's mother, this is the type of behavior that could facilitate "complicity with the long term secrecy of the acts" and reduce Emily's credibility.[90] Specifically, the Government's expert testified that grooming does not only consist of behavior that *predates* sexual abuse; it can also consist of behavior that *post-dates* prior sexual abuse. Pertinent to this case, the Government's theory of non-propensity relevance was that Appellant provided alcohol to Emily in 2016, in part, to perpetuate an ongoing relationship of secrecy and special favors to make it more likely that Emily would remain silent about his prior abuse. This satisfies the second *Reynolds* prong. Finally, conducting the balancing test under Mil. R. Evid. 403, the military judge found the probative value of the evidence was that it suggested a plan to "desensitize [Emily] to illicit, risk-taking behavior and to encourage her to keep it secret from her mother," and this was not substantially outweighed by the danger of unfair prejudice or any other factors set forth in Mil. R. Evid. 403. We agree with the military judge's analysis and application of the law and find no abuse of discretion.

---

[87] 75 M.J. 350 (C.A.A.F. 2016) (charged offenses not admissible as propensity evidence under Mil. R. Evid. 413 to prove other charged offenses).

[88] *Id.* at 355. ("Charged misconduct is already admissible at trial under M.R.E. 401 and 402, and it is not subject to exclusion under M.R.E. 404(b). Thus, as a matter of logic, it does not fall under M.R.E. 413, which serves as an exception to M.R.E. 404(b).").

[89] *Ellis*, 68 M.J. at 344.

[90] App. Ex. LVI at 2.

**F. Appellant Must Exhaust His Administrative Remedies Before Seeking Judicial Relief for Post-Trial Confinement Conditions**

Appellant's final two AOEs are submitted pursuant to *United States v. Grostefon*.[91] Appellant is confined at the Naval Consolidated Brig Miramar and, due to the Brig policy, is prevented from communicating with his biological sons, who are now approximately ten, nine, and four years old, and were not alleged to be the victims of any of his offenses. This policy has, apparently, resulted in them having had no contact with their father for the past several years. During sentencing, EJ testified about the effect of Appellant's actions on the family, saying, "And the boys questioning every day where their dad is, having to be on our toes around them, so they don't know anything. They think he's on deployment."[92]

Appellant challenges the Brig policy under Article 55, UCMJ,[93] and the First, Fifth, and Eighth Amendments to the Constitution. He argues the policy deprives him of his parental rights in violation of Article 55, UCMJ, and the Eighth Amendment's prohibition against "cruel and unusual punishment" and also violates his right to familial association under the First and Fifth Amendments.

While this Court has the authority to review Appellant's alleged errors arising from the violations of Article 55, UCMJ, and the Eighth Amendment, we will not consider his assignment of error arising under the First and Fifth Amendments. Our superior court has specifically held that the "practice of considering material outside the record should not be expanded beyond the context of Article 55, UCMJ, and the Eighth Amendment."[94]

*1. Standard of review and the law*

We review allegations of violations of the Eighth Amendment and Article 55, UCMJ, de novo.[95] This Court has authority under Article 66, UCMJ, to "ensure that the severity of the adjudged and approved sentence has not been unlawfully increased by prison officials."[96] Appellant must show "as an

---

[91] 12 M.J. 431 (C.M.A. 1982).

[92] Record at 1755.

[93] 10 U.S.C. § 855 (2016) (cruel and unusual punishments prohibited).

[94] *United States v. Jessie*, ___ M.J. ___, No. 19-0192, 2020 CAAF LEXIS 188 at *20-21 (C.A.A.F. Apr. 6, 2020).

[95] *United States v. Pena*, 64 M.J. 259, 265 (C.A.A.F. 2007).

[96] *United States v. White*, 54 M.J. 469, 472 (C.A.A.F. 2001).

objective matter, that the alleged abuse or harassment caused pain and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind."[97]

### 2. Administrative remedies

A prisoner "must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions."[98] A prisoner, absent "unusual or egregious circumstance" must demonstrate he has (1) "exhausted the prisoner-grievance system" and (2) "petitioned for relief under Article 138, UCMJ."[99] We review de novo the mixed question of law and fact of "whether an Appellant [has] exhausted administrative remedies."[100]

### 3. Analysis

At first blush, the Brig policy appears to be arbitrary and tailored solely for the administrative convenience of the Brig rather than to address any specific valid concern over prisoner or guard safety, child safety, or maintaining good order and discipline. The problem is, we only have a first blush and not a complete picture. Had Appellant filed an Article 138, UCMJ, complaint and exhausted whatever administrative remedies the Brig offers and attached them to the record, we would have a more complete picture. During appeal, the only documents Appellant moved to attach to the record were a copy of Naval Consolidated Brig Miramar Minor Contact Policy dated 11 January 2016 and a 2008 article from the Urban Institute Justice Policy Center, "Broken Bonds: Understanding the Needs of Children With Incarcerated Parents." We granted that Motion but received nothing else from Appellant. Because there is no evidence he sought administrative relief or filed an Article 138, UCMJ, complaint, we find Appellant has not sought the necessary administrative remedies before seeking judicial relief.

However, we feel compelled to add that conditions in confinement amounting to Article 55, UCMJ, or Eighth Amendment violations are fair

---

[97] *Id.* at 474. (internal quotation marks omitted) (quoting *Freitas v. Ault*, 109 F.3d 1335, 1339 (8th Cir. 1997)).

[98] *United States v. Wise*, 64 M.J. 468, 471 (C.A.A.F. 2007) (citing *White*, 54 M.J at 472).

[99] *White*, 54 M.J. at 472 (citation and internal quotation marks omitted).

[100] *Wise*, 64 M.J. at 471.

game for appellants to petition for relief from this Court.[101] Under Article 66, UCMJ, we are *required* to only approve sentences that are "correct in law and fact." Should some action by the Government convert a sentence that is "correct" as adjudged and approved by the convening authority into one that is not "correct," then we would be obligated to intervene.[102] We ultimately approve a sentence "on the basis of the entire record"[103]—which we should note could easily include items attached to the record during appeal. But that is up to an individual appellant to decide what he moves this Court to attach.

In *United States v. Jessie*, our superior court held that in fulfilling our duties to affirm only so much of a sentence that is correct in law and to determine sentence appropriateness, we have clear authority to consider "materials outside the entire record"[104] when it comes to Article 55, UCMJ, and Eighth Amendment claims. That being said, the hurdle to an appellant seeking such relief, absent an "unusual or egregious circumstance,"[105] is to exhaust his administrative remedies at the brig and file an Article 138, UCMJ, complaint. If an appellant desires to attach records demonstrating such an allegation and the remedies sought, we surely have the authority to attach those documents to the record and use them in considering whether a violation occurred and whether the sentence continues to be "appropriate." In the face of brig policies that violate a post-conviction prisoner's Article 55, UCMJ, and Eighth Amendment rights, we have the authority to affirm only so much of a sentence that is correct in law and that is appropriate.

That is not to say this Court will engage in clemency, which is "bestowing mercy" and "treating an accused with less rigor than he deserves."[106] "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets *the punishment he deserves*."[107] Confinement conditions may very well alter an accused's punishment into something *worse*

---

[101] *United State v. Gay*, 75 M.J. 264, 267 (C.A.A.F. 2016).

[102] *United States v. Erby*, 54 M.J. 476, 477 (C.A.A.F. 2001) (quoting *White*, 54 M.J. at 472) (finding CCAs have Art. 67(c), UCMJ, authority "to determine . . . if the adjudged and approved sentence is being executed in a manner that offends the Eighth Amendment or Article 55").

[103] Article 66, UCMJ.

[104] *Jessie*, 2020 CAAF LEXIS 188 at *10.

[105] *White*, 54 M.J. at 472 (citation and internal quotation marks omitted).

[106] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1984).

[107] *Id*. (emphasis added).

than he deserves.[108] It has been said that "since adherence to the principles of 'law' does not invariably produce justice, equity is necessary."[109] Article 66 in that sense is a statutory paradox; the "Chancellor's foot"[110] is sometimes what the law requires, rather than a tool of last resort. Still, we must be mindful of Blackstone's warning of the dangers of "equity without law"[111]—which is precisely why this Court must insist on administrative measures being pursued by an appellant and some record on which to base our use of our statutory powers of quasi-equity.[112] The "awesome, plenary de novo power of review"[113] of this Court, and of our sister service courts of criminal appeals, has been called the "proverbial 800-pound gorilla when it comes to their

---

[108] *White*, 54 M.J. at 475 (Sullivan, J., concurring) ("I am heartened that this Court has finally and squarely held in this case and also in *United States v. Erby*, 54 M.J. 476 (C.A.A.F. 2001), that the lower courts have the duty and the jurisdiction to review whether the sentence imposed by a court-martial is being unlawfully increased by prison officials.").

[109] *Simonds v. Simonds*, 45 N.Y.2d 233, 239 (N.Y. 1978) (citing Aristotle, *Nichomachean Ethics*, Book V, ch 9, pp 1019-1020 [McKeon, ed Oxford: Clarendon Press, 1941] ("Law without principle is not law; law without justice is of limited value").

[110] *See Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 332-33 (1999) (Scalia, J.) (Quoting seventeenth-century English scholar John Selden's *Table Talk*, "For law we have a measure, and know what to trust to—Equity is according to the conscience of him, that is Chancellor; and as that is larger, or narrower, so is Equity. 'T is all one, as if they should make the standard for the measure the Chancellor's foot. What an uncertain measure would this be? One Chancellor has a long foot; another a short foot; a third an indifferent foot. It is the same thing with the Chancellor's conscience."). *See also*, *United States v. Nerad*, 69 M.J. 138, 149 (C.A.A.F. 2010) (Stucky, J., dissenting) (*cert. denied*, 562 U.S. 1065 (2010)).

[111] "And law without equity, though hard and disagreeable, is much more desirable for the public good, than equity without law: which would make every judge a legislator, and introduce most infinite confusion; as there would then be almost as many different rules of action laid down in our courts, as there are differences of capacity and sentiment in the human mind." 1 William Blackstone, *Commentaries.* *62.

[112] This Court and our sister courts of criminal appeals are not courts of equity. Our superior court has held that our Article 66(c), UCMJ, powers, are not "unfettered" and must be "exercised in the context of legal—not equitable—standards, subject to appellate review." *Nerad*, 69 M.J. at 140 (citing *United States v. Quiroz*, 55 M.J. 334, 339 (C.A.A.F. 2001)), *cert. denied*, 562 U.S. 1065 (2010).

[113] *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (quoting *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).

ability to protect an accused."[114] But if the proverbial 800-pound gorilla acts arbitrarily, Congress will permanently "lock this gorilla in a cage."[115]

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59, 66, UCMJ.

The findings and sentence are **AFFIRMED**.

Senior Judge TANG and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[114] *United States v. Jessie*, 2018 CCA LEXIS 609 (A. Ct. Crim App. Dec. 28, 2018) at *25 (Schasberger, J., dissenting) (unpub. op.) (quoting *United States v. Parker*, 36 M.J. 269, 271 (C.M.A. 1993), *aff'd*, ___ M.J. ___, No. 19-0192, 2020 CAAF LEXIS 188 (C.A.A.F. Apr. 6, 2020).

[115] *Id*.